1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10  PENNY ARNOLD,

11            Plaintiff,                    No. 2:10-cv-3119 KJM GGH PS

12       vs.

13  COUNTY OF EL DORADO, et al.,
                                            ORDER and
14
            Defendants.                     FINDINGS & RECOMMENDATIONS
15  _____/

16            Previously pending on this court's calendar for July 2, 2012, was an evidentiary

17  hearing in connection with defendants' motion for terminating and monetary sanctions, filed

18  April 2, 2012.  Plaintiff filed an opposition on April 18, 2012.  Andrew Caulfield appeared for

19  defendants.  Plaintiff appeared in pro se.  Having heard testimony and argument, admitted

20  evidence, and reviewed the papers in support of and in opposition to the motion, the court now

21  issues the following order and findings and recommendations, recommending that defendants'

22  motion be granted.

23            The motion here involves, in part, plaintiff's needless obstreperousness in

24  discovery, but more importantly, additionally involves an allegation that plaintiff committed

25  perjury during her deposition pertinent to a material fact in this litigation.  For the reasons

26  expressed below, there is no doubt that plaintiff did perjure herself; the issue becomes what to do

1

1   about it.  Courts have struggled with the issue, but the better reasoned opinions permit a

2   dismissal of the case of the party committing perjury.  Given the entire backdrop of the discovery

3   problems herein, the case should be dismissed. [1]

4   <u>BACKGROUND</u>

5          This action was brought against El Dorado County and two deputy sheriffs, Ken

6   Brown and Scott Crawford, in regard to their treatment of plaintiff during two visits to the El

7   Dorado County courthouse.  Before the court is the second amended complaint, filed September

8   26, 2011.  Plaintiff alleges that these deputies "wrongfully detained [her], utilized excessive

9   physical violence and force upon her in a public place, battered her, permanently injured her, and

10   arrested her in violation of her rights as guaranteed her by the United States Constitution, federal

11   civil rights laws, and California law."  (SAC ¶ 1.)

12          Allegations pertinent to the evidentiary hearing and defendants' motion for

13   terminating sanctions are that on July 16, 2010, defendant officers attacked plaintiff on the orders

14   of Judge Waggoner for using her cell phone to videotape people in the lobby area.  (<u>Id.</u> at ¶¶ 6,

15   10.)  The SAC states in part:

16            8.  Knowing through her appearance at prior dependency hearings
17            that it can take anywhere from minutes to many hours before her
              case is called, Plaintiff passed her time in the lobby playing a game
18            on her cell phone and sending text messages.  She did not have her
              glasses that morning and, as a result, Plaintiff had difficulty seeing
19            the buttons on her phone clearly and often had to hit the same
              buttons over and over on the phone.  Plaintiff, who had been
20            involved in the juvenile dependency hearing process concerning
              her son since 2008, had utilized her cell phone in substantially the
21            same manner on numerous prior occasions without incident.
              Plaintiff also witnessed this same type of cell phone usage by other
22            courtroom patrons, including County employees, on numerous
              prior occasions.

23

24         [1]As a preliminary matter, the issue of perjury in regard to plaintiff's financial status has
    not been addressed here because review of plaintiff's financial documents, submitted for *in*
25   *camera* review, indicated, as stated in the May 17, 2012 order, that plaintiff was not deceptive in
    her representations to the court with respect to her financial status.  (Dkt. no. 47.)  Defendants'
26   motion for terminating sanctions will not be granted based on this ground.

1  (Id. at ¶ 8.)  Plaintiff emphatically states that on July 16, 2010, "[p]laintiff was absolutely **not**

2  using her cell phone to videotape anything at this time.  (Id. at ¶ 9.) (emphasis in original.)  Of

3  course, whether plaintiff was using her cell phone to videotape was a material fact in this

4  litigation in that it precipitated the entire series of events culminating in the excessive force

5  allegations.  Whether plaintiff had committed any misconduct, while not dispositive of the

6  excessive force allegations, was important in placing the defendants' actions in an appropriate

7  context.  Such a context might well make the difference between a punitive damages verdict and

8  one without, assuming that a jury were to find the facts generally in plaintiff's favor.

9         Findings and Recommendations filed November 23, 2011, construed the SAC as

10  containing claims for excessive force only, and recommended that an answer to the SAC be filed

11  within fourteen days of an order adopting those findings and recommendations.  (Dkt. no. 24.)

12  Those findings were adopted after the evidentiary hearing.  Nevertheless, the parties have

13  previously engaged in discovery which led to the instant motion for terminating sanctions.

14         The first indication of plaintiff's recalcitrance in discovery was presented in

15  defendants' motion to compel, filed in January, 2012.  As summarized in the order filed February

16  23, 2012, "[d]efendants demonstrate, without a contrary factual assertion by plaintiff, that they

17  have rescheduled plaintiff's deposition multiple times, but that after agreeing to a second

18  rescheduling they warned plaintiff that they would not agree to a third rescheduling.  Plaintiff

19  attempted to unilaterally reschedule a third time and then failed to appear at her January 24, 2012

20  deposition.  She also failed to produce documents by January 24, 2012, after being given multiple

21  extensions of time." (Dkt. no. 29 at 2.)  The order required plaintiff's deposition to occur on

22  February 21, 2012, and that plaintiff produce remaining documents and discovery responses at

23  that deposition.  Although defendants had requested terminating sanctions at that time, the court

24  issued only monetary sanctions in the amount of $2,220 for plaintiff's unjustified behavior, to be

25  deferred pending a plaintiff verdict in the case, based on her representation of poverty.  Plaintiff

26  was warned, however, "that failure to appear at this deposition and produce requested documents

1   and responses will result in further sanctions, including the dismissal of her case and the

2   possibility of contempt charges." (Id. at 5.)

3               On April 2, 2012, defendants filed the instant motion, claiming that plaintiff

4   violated the previous order in failing to serve written discovery responses, and because she

5   committed perjury during her deposition, as well as obstructed her deposition by being

6   knowingly false/evasive in her responses.  The parties were ordered to submit evidence

7   concerning the motion[2] and on May 17, 2012, after reviewing the submitted evidence, the

8   undersigned found, in adjudicating one part of the motion, that plaintiff had not misrepresented

9   her financial status in court.

10             Defendants' claims of perjury regarding plaintiff's deposition testimony

11   concerning the alleged videotaping at the superior court was another matter altogether.  The

12   evidence submitted indicated that plaintiff's denial of videotaping was false.  Therefore, an

13   evidentiary hearing on this issue was ordered.  The parties were directed to present "testimony

14   and/or evidence to support their position that plaintiff did or did not take videos with her cell

15   phone on the date at issue in her second amended complaint." (Dkt. no. 47 at 4.)  An evidentiary

16   hearing was held on July 2, 2012.

17             In addition, defendants have re-submitted other evidence/examples of plaintiff's

18   refusal to comply with discovery orders of the court and numerous other examples of false

19   statements in the deposition and/or evasive answers.

20   <u>DISCUSSION</u>

21   I. <u>Available Sanctions and Standards</u>

22             The court must first determine what sanctions are available for this situation

23   which might justify a dismissal, and then define the standards for issuance of such sanctions.

24

25        [2]  The April 30, 2012 order warned plaintiff that her case was in serious jeopardy and that

26   failure to comply with that order would be considered for defendants' sanctions motion.  (Dkt. no. 45.)

Defendants moved for sanctions, including terminating sanctions, on four grounds:

1. Fed. R. Civ. P. Rule 11

2. Inherent authority of the court[3]

3. Fed. R. Civ. P. 37

4. 28 U.S.C. § 1927

Rule 11 is not available as a means by which to grant the motion.  Insofar as false discovery certifications/disclosures are at issue, Rule 11 does not apply to such.  See Rule 11(d). Moreover, and more importantly, insofar as false statements in the complaint are concerned, to which Rule 11 could apply, defendants have made no showing that they complied with the mandatory notice procedures set forth in the Rule.  See Rule 11(c)(2).  As such, the Rule cannot stand as a basis for terminating sanctions because of alleged false statements in the amended complaint.  The remaining three grounds are potentially available.

Rule 37 authorizes "a wide range of sanctions" for a party's failure to comply with discovery rules or court orders enforcing them.  Wyle v. R.J. Reynolds Industries, Inc., 709 F.2d 585, 589 (9th Cir. 1983).  Penalizing a party "for dilatory conduct during discovery proceedings" is discretionary.  Bollow v. Federal Reserve Bank of San Francisco, 650 F.2d 1093, 1102 (9th Cir. 1981) (citing Fed. R. Civ. P. 37(a)(4)).   Rule 37 provides remedies for obstructiveness in discovery ranging from milder monetary sanctions to preclusion of evidence to outright dismissal.

Precluding evidence for discovery misconduct so that the recalcitrant party cannot support defenses is comparable to entering dismissal, which "represent[s] the most severe penalty

---

[3]  In the notice of motion, defendants omitted moving on this ground.  However, in the accompanying Memorandum of Points and Authorities, defendants made clear that the inherent authority of the court was a ground on which dismissal could be made, and repeated that assertion in the reply brief.  The undersigned finds that plaintiff was placed on sufficient notice that the motion for terminating sanctions was made, in part, based on the inherent authority of the court.  Moreover, plaintiff made no objection that she had been somehow prejudiced in not knowing of this ground for terminating sanctions.

that can be imposed." U.S. v. Kahaluu Const., 857 F.2d 600, 603 (9th Cir. 1988); accord, Valley

Engineers v. Electric Engineering Co., 158 F.3d 1051 (9th Cir. 1998).  Accordingly, such

sanctions  are authorized only in "extreme circumstances" for violations "due to willfulness, bad

faith, or fault of that party." Kahaluu Const., 857 F.2d at 603; see also Commodity Futures

Trading Com'n v. Noble Metals Intern., Inc., 67 F.3d 766,770 (9th Cir. 1995) (affirming standard

and upholding sanctions in egregious circumstances).[4]  Bad faith does not require actual ill will;

substantial and prejudicial obduracy may constitute bad faith.  B.K.B. v. Maui Police Dept., 276

F.3d 1091, 1108 (9th Cir. 2002).

        Five relevant factors also determine whether severe sanctions are appropriate:

>(1) the public's interest in expeditious resolution of litigation;
>(2) the court's need to manage its docket;
>(3) the risk of prejudice to the other party;
>(4) the public policy favoring disposition of cases on their merits;
>and
>(5) the availability of less drastic sanctions.

Wanderer v. Johnston, 910 F.2d 652 (9th Cir. 1990) (default judgment for defendants' failure to

comply with discovery); Malone v. U.S. Postal Service, 833 F.2d 128, 130 (9th Cir.1987).

        Being obstructive in discovery may also be sanctionable under 28 U.S.C. 1927.

Section 1927 permits recovery of excess costs, including attorney's fees, against an attorney who

unreasonably and vexatiously multiplies proceedings.  A § 1927 award requires a finding that the

attorney to be assessed not only multiplied the proceedings but did so recklessly or in bad faith.

---

[4]  See also, e.g., Fjelstad v. American Honda Motor Co., Inc., 762 F.2d 1334, 1338 (9th Cir. 1985) ("'Where the drastic sanction of dismissal . . . [is] imposed . . . the range of discretion is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith,'" quoting Sigliano v. Mendoza, 642 F.2d 309, 310 (9th Cir.1981); G-K Properties v. Redevelopment Agency, 577 F.2d 645, 647-48 (9th Cir.1978) (bad faith crucial in Rule 37 dismissal, citing National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S. Ct.  2778 (1976)); Henry v. Gill Industries, Inc, 983 F.2d 943, 946, 948-49 (9th Cir.1993) (reviewing Rule 37 dismissal under multiple factors, including willfulness, bad faith or fault); Porter v. Martinez, 941 F.2d 732, 733 (9th Cir.1991) (reviewing Rule 37 default judgment pursuant to multiple factors including bad faith); Wanderer v. Johnston, 910 F.2d 652, 655-56 (9th Cir.1990) (same).

1   Goehring v. Brophy, 94 F.3d 1294, 1306 (9th Cir.1996); Kanarek v. Hatch, 827 F.2d 1389, 1391

2   (9th Cir.1987).  Section 1927 sanctions also may be imposed against pro se litigants.  Wages v.

3   I.R.S., 915 F.2d 1230, 1235-36 (9th Cir. 1990).  The standard is subjective bad faith, and the

4   court need not find objectively unreasonable behavior as well.  Salstrom v. Citicorp Credit

5   Services, Inc., 74 F.3d 183, 184 (9th Cir.1996).

6              The undersigned now turns to the legal standards which guide this court's

7   determination, if, in fact, perjury is found.  There is no specific rule which discusses sanctions for

8   perjury.  Although Fed. R. Civ. P. 26 (g)(3) discusses sanctions for false certifications as the

9   accuracy of discovery responses, a "certification" is not at issue here.  Therefore, the sanctions

10  available to the undersigned, if dismissal is warranted by the facts, stems from the inherent power

11  of the court.  See Chambers v. NASCO, Inc., 501 U.S. 32, 111 S.Ct. 2123 (1991).  See also Fink

12  v. Gomez, 239 F.3d 989, 992-993 (9th Cir. 2001).  The inherent power of the court to award

13  sanctions

14              is "both broader and narrower than other means of imposing
            sanctions." Id. at 46, 111 S.Ct. 2123. On the one hand, the inherent
15          power "extends to a full range of litigation abuses." On the other,
            the litigant must have "engaged in bad faith or willful disobedience
16          of a court's order." Id. at 46-47, 111 S.Ct. 2123.

17  Id., 239 F.3d at 992.

18              Perjury is defined in federal criminal law as "false testimony concerning a

19  material matter with the willful intent to provide false testimony, rather than as a result of

20  confusion, mistake, or faulty memory."  United States v. Dunnigan, 507 U.S. 87, 94, 113 S.Ct.

21  1111 (1993) (summarizing the elements of 18 U.S.C. § 1621).  Clearly, committing perjury is

22  acting in "bad faith."  "Dismissal is an appropriate sanction for falsifying a deposition." .... [T]he

23  court's inherent powers[] can be called upon to redress such mendacity."  Combs v. Rockwell

24  Inter. Corp., 927 F.2d 486, 488 (9th Cir. 1991).  "Falsifying evidence is grounds for the

25  imposition of the sanction of dismissal."  Id.  There need be no look at the merits of a lawsuit if

26  material, substantial perjury is found.  Id at 489.  As stated in Valley Engineers Inc. v Electric

7

1   Engineering Co., 158 F.3d at 1058: "There is no point to a lawsuit, if it merely applies law to

2   lies.  True facts must be the foundation for any just result."  While perjury should not be

3   confused with inconsistencies in a party's deposition and trial testimony which may "provide

4   fertile ground for vigorous impeachment but do not support perjury findings," Montano v. City

5   of Chicago, 535 F.3d 558, 564 (7th Cir. 2008), when a party falsely testifies to a fact material to

6   the substance of a litigation, such is anathema to the function of the courts.  Perjury is much more

7   than simply a "gotcha," harmful in effect only for the reason that one got caught.  Litigation is

8   not a game in which perjury warrants a five yard penalty for a minor untruth, fifteen yards if the

9   perjury was really serious.  Rather, perjury on any material fact strikes at the core of the judicial

10  function and warrants a dismissal of one's right to participate at all in the truth seeking process.

11  If one can be punished for perjury with up to five years imprisonment, 18 U.S.C. § 1621, it

12  should not seem out of place that a civil action might be dismissed for the same conduct.[5]

13          Nevertheless, in the context of setting aside or modifying judgments, and without

14  citation to the above Ninth Circuit authority, other Ninth Circuit cases hold that "'perjury by a

15  party or witness, by itself, is not normally fraud on the court.'" United States v. Estate of

16  Stonehill, 660 F.3d 415, 444 (9th Cir. 2011) citing In re Levander, 180 F.3d 1114, 1119 (9th Cir.

17  1999).  "In order to show fraud on the court, ....[a party] must show more than perjury or non-

18  disclosure of evidence, unless that perjury or non-disclosure was so fundamental that it

19  undermined the workings of the adversary process itself." Stonehill, 660 F.3d at 445.  In

20

21          [5]See also Brown v. Oil States Skagit Smatco, 664 F.3d 71 (5th Cir. 2011) (dismissal with
    prejudice was warranted for plaintiff's perjury at his deposition; Anheuser-Busch, Inc. v. Natural
22  Beverage Distributors, 69 F.3d 337, 348 (9th Cir. 1995) (court properly dismissed counterclaim
    where party had concealed documents for three years and continuously lied about their existence
23  under penalty of perjury); Thomas v. General Motors Acceptance Corp., 288 F.3d 305, 306-07
    (7th Cir. 2002) (dismissal for false allegation of poverty in IFP application appropriate where
24  monetary sanction would be difficult to collect); Chavez v. City of Albuquerque, 402 F.3d 1039
    (10th Cir. 2005) (perjury in deposition and answers to interrogatories warranted dismissal, and
25  there was no requirement to warn party deponent not to commit perjury once he swears to give
    truthful answers); Allen v. Chicago Transit Auth., 317 F.3d 696, 703 (7th Cir. 2003) (dismissal
26  as sanction for repeated discovery-related perjury was proper); Pope v. Federal Exp. Corp., 974
    F.2d 982 (8th Cir. 1992) (dismissal for perjured testimony).

reconciling the two lines of authority, it appears that in the setting aside or reopening judgments context, perjury will not be grounds for upsetting a judgment when the fact of the untruth was known and could have been challenged during the proceeding itself.  Levander, 180 F.3d at 1120. Here, defendants are challenging the asserted untruth in the proceeding before it has become final.  Thus, the Combs line of authority is more appropriately in play for defendants' motion.  In any event, as set forth below, there is "more."

II.  Preliminary Motions

        Prior to the evidentiary hearing, the parties filed various motions.  Plaintiff has filed documents entitled "Judicial Notice," (dkt. no. 52), "Motion to Reconsider" (dkt. no. 57), "Motion of Injunction," (dkt. no. 60), and "Motion to Amend."  (dkt. no. 61).  These filings attempt for the most part to object to the evidentiary hearing and defendants' motion for terminating sanctions, and as such are belated back door attempts to file additional oppositions or appeals.  To the extent that the motions concern the merits of the case, they are not relevant to the issues framed for the evidentiary hearing.  Therefore, they will not be considered.

        Defendants' motion in limine, (dkt. no. 55), seeks to exclude all evidence at the evidentiary hearing which does not directly relate to the issue of whether plaintiff did or did not take videos with her cell phone on the date at issue in her SAC.  As this court's May 17, 2012 order clearly delineated the issue for evidentiary hearing, defendants' motion is denied as unnecessary.

III.  Request for Judicial Notice[6]

        Defendants request that the court take judicial notice of all filings in this action, documents downloaded from the California Department of Real Estate website relating to the license granted by the Department of Real Estate to Penny Arnold, documents received from the

_____

        [6] As discussed in the previous section, plaintiff's document entitled "judicial notice" is not in fact a request for judicial notice, but rather argument opposing the merits of defendants' motion.

9

1  Department of Real Estate and certification of them, and a printout from the California State Bar

2  website indicating that plaintiff is not an attorney licensed in California.

3          Defendants' requests for judicial notice are granted pursuant to Fed. R. Evid. 201,

4  as they do not require the acceptance of facts "subject to reasonable dispute" and are capable of

5  immediate and accurate determination by resort to a source whose accuracy cannot be reasonably

6  questioned.  See In re Tyrone F. Conner Corp., Inc., 140 B.R. 771, 781-82 (E.D. Cal. 1992); Fed.

7  R. Evid. 201(b); Cal. ex. rel. RoNo, L.L.C. v. Altus Fin. S.A., 344 F.3d 920, 931 n. 8 (9th Cir.

8  2003).  The court also takes notice of its own records in this action.  United States v. Wilson, 631

9  F.2d 118, 119 (9th Cir. 1980) (a court may take judicial notice of its own records).

10  IV.  The Asserted Perjury

11          As set forth in the following section, there were many questions which were

12  answered by plaintiff's "I can't recall," and the like which were obviously untrue; but these

13  untruths, spoken more for the purpose of breaking down the discovery process, were not material

14  to the substance of the case.  They will be addressed as additive to the substantive perjury.  The

15  material perjury occurred when plaintiff was asked about her cell phone usage in the El Dorado

16  County Courthouse, the event which precipitated plaintiff's lawsuit.

17          Q.  Okay. Before being confronted by Judge Wagoner and the
        bailiffs, were you taking videos in the court lobby on July 16, 2010

18          with your cell phone?
        A.  Not that I'm aware of.  I didn't have my glasses with me.  I

19          can't see my cell phone.
        Q.  On July 16, 2010, did you know how to take a video with your

20          cell phone?
        A.  Not without my glasses, and I did not have my glasses with me

21          at the courthouse that day.
        Q.  So you don't know one way or another whether or not you were

22          taking videos with your cell phone that day?
        A.  I was pushing all sorts of buttons.

23          Q.  At any point in time on July 16, 2010 while you were in the
        courthouse or the courthouse lobby, did you take any videos with

24          your cell phone?
        A.  Not that I'm aware of.

25          (Dep. Tr. at 358-59.)
        Q.  Is it your testimony today, Ms. Arnold, that the deputies took

26          your cell phone and took videos with your cell phone?

A.  I'm saying there's a high likely probability because they took the cell phone off of me and the recording device and it was gone for 40 minutes.  I don't know what was done with it.
...
Q.  Okay.  So your second amended complaint states that you were absolutely not using your cell phone to videotape anything.  Is that a true statement?
A.  Yes.

(Id. at 360.)

Plaintiff testified that she was playing games and doing "anything else that my cell phone would allow me to do to pass the time."  (Id. at 363:16-17, 364:18-20.)  When asked whether there were any videos on her cell phone, plaintiff responded: "I don't know how to do videos."  (Id. at 365:20-21.)

Defendants vigorously asserted that plaintiff was indeed using her cell phone to video the sitting area and persons outside the dependency court area, and argue that such falsity on plaintiff's part warrants dismissal.  The undersigned determined that an evidentiary hearing was necessary to adjudicate defendants' perjury allegations.

At the evidentiary hearing, defendants presented evidence in the form of witnesses and videos taken from plaintiff's cell phone on the date of the alleged videotaping in the courthouse, July 16, 2010.  Plaintiff presented her own testimony.  That evidence is summarized below.

A.  Plaintiff's Testimony

1.  Cross-Examination of Plaintiff by Defense Counsel

Defendants called plaintiff as their first witness, in order to set the record as to whether plaintiff would admit or deny videotaping with her cell phone on the day in question.  In regard to the cell phone plaintiff had with her on July 16, 2010, she testified that she may have possibly taken video with it prior to that date, but since she did not know how to record video with that phone, it would not have been purposeful.  On July 16, 2010, plaintiff testified that she did not know how to videorecord with her cell phone, and if she did so, it was not purposeful for this reason and because she is blind in her right eye and has partial vision in her left eye.

Plaintiff testified that while she was seated in the lobby area, two bailiffs and an unidentified man dressed in plain clothes, later identified as Judge Wagoner, confronted her by accusing her of using her cell phone to videorecord.  Plaintiff responded that she was not videorecording with her phone.  In response to defense counsel's question whether she was taking video with her cell phone, she testified that she was pushing buttons with her bad vision, and did not have her eyeglasses with her, and could have possibly unknowingly videotaped.  She testified that she did not intentionally videotape.  To the extent there are videos on her cell phone, plaintiff testified that they were an accident.  To explain the distinction between her SAC which states unequivocally that plaintiff did not take videos with her cell phone, and her testimony at the evidentiary hearing, which concedes that she may have unintentionally taken videos, plaintiff testified that her statement changed after defendants provided her with the videos from her phone which she had not seen since her phone was confiscated on July 16, 2010, since it was never returned to her.  She testified that she was truthful when she filed paperwork previous to defendants' production of the videos in the last few months.  In response to counsel's question whether plaintiff intended to take video on July 16, 2010 at the courthouse, plaintiff responded, "no."

Defense counsel introduced Exhibit 1, a government claim plaintiff had filed with the County of El Dorado concerning the actions of court personnel on that day.  The claim contains a section entitled "affidavit of fact," which states that plaintiff was pressing buttons on her cell phone while she was waiting for her case to be called.  The affidavit states that plaintiff usually uses her phone to text, make calls and play games while she waits.  She is far sighted and did not have her glasses so she was holding her phone at arm's length to better see.  The man later identified as Judge Wagoner asked plaintiff if she was recording on her cell phone.  Plaintiff responded, "no I was playing with it in my hand and pushing the various buttons." (Aff. at 3.)  It was signed by plaintiff under penalty of perjury. (Aff. at 10.)  Counsel asked plaintiff in this regard whether she denied that she was recording video, and she responded in the affirmative,

1   that she was not intentionally recording.  Defense counsel then introduced Exhibit 2, the

2   transcript from the contempt proceedings before Judge Wagoner.  During plaintiff's apology to

3   the court, she stated, "I was not taking pictures."  (Ex. 2 at 5:2.)  When asked about this

4   statement at the evidentiary hearing, plaintiff explained that the statement was true at the time,

5   that she was not knowingly taking pictures.  Plaintiff conceded that the transcript did not use the

6   term "knowingly."

7          When counsel asked plaintiff if she was scanning the courthouse lobby with her

8   phone and pushing buttons, she responded that she was not purposely scanning the room and

9   pushing buttons, but she could possibly have pushed buttons accidentally as she was viewing her

10  cell phone in different directions and holding it in different ways as necessitated by her vision

11  and the glare in the room.  Plaintiff testified that she was randomly pushing buttons to pass time.

12  She stated that there are texting applications, videos, newspaper applications, but she did not

13  recall if she was using them because she could not see them.  When asked by the court, plaintiff

14  testified that she had actual physical keypad buttons on her phone, that it was not a touch screen

15  phone.  Plaintiff then testified that she was not tech savvy and had limited vision, and for these

16  reasons she did not know whether she could figure out how to take or delete video from her cell

17  phone, but that it would be highly difficult.

18         Plaintiff was then questioned about Exhibit 3, which is an examination report of

19  plaintiff's cell phone taken on July 16, 2010.  It contains photos of plaintiff's dogs.  Plaintiff

20  testified that she did not know if she took those photos or whether someone else did.  This report

21  reflects one video, dated May 27, 2010, and four videos, dated July 16, 2010.  (Ex. 3 at 2-3.)

22  When asked if plaintiff knew how these videos got on her phone, she testified that she was

23  standing by her earlier statement that she was pushing numerous buttons without her corrective

24  lenses, so as not to purposely videotape anybody or anything.  When asked if she had

25  intentionally taped video of any CPS attorneys or juveniles in the courthouse lobby, plaintiff

26  responded, "no."

1          2.  <u>Plaintiff's Testimony in Support of Her Case</u>

2          After all witnesses testified, plaintiff testified for her case.  She testified that she

3   has always maintained she was not recording with her cell phone, purposefully or not.

4   Furthermore, she has maintained that her vision was bad, as supported by documentation

5   submitted to the court.  She also testified that her vision has gotten "way worse" since July 16,

6   2010.  She testified that she had been acting no differently on that day than on any other visit to

7   family court since she has been going there, beginning in 2008.  She testified that she was not

8   videotaping, that she was pushing buttons only.  She now sees that there are four videos, two of

9   which might be a stairway or her leg, and that only two videos are of people, but that she was

10  absolutely not purposely or maliciously videotaping people.  She testified that she could have

11  accidentally pushed a button which turned on the videorecorder on her cell phone.  She testified

12  that she truthfully gave testimony at her deposition in response to the question whether she was

13  videotaping at the courthouse, but that defense counsel's question at deposition was phrased so

14  that it could only be answered yes or no.

15          Plaintiff further testified that since the cell phone was seized on July 16, 2010, she

16  has not had it in her possession.  She was only provided with a copy of the CD of the videos a

17  few months ago.  Of the four videos taken on July 16th, plaintiff estimates that they total less

18  then thirty seconds in length, with each video taking only a few seconds, i.e. three seconds, three

19  seconds, ten seconds, and twelve seconds.  Furthermore, plaintiff testified, there was no

20  discernable audio on the videos.  Contrary to the witnesses' testimony that plaintiff was taping

21  for five minutes, there is no tape that lasts five minutes.  Plaintiff testified that she found it hard

22  to believe that Sgt. Dreher could carry around her cell phone all over the world, all day.  She also

23  stated that Sgt. Dreher accused her of possibly erasing video.  Plaintiff concluded by again stating

24  that she was not purposely videotaping anyone.

25          Defense counsel then cross-examined plaintiff by asking whether if in fact this

26  videotaping was an accident, wasn't it true that it would have had to have been four separate

14

1  accidents, and her phone would have had to have been pushed and stopped four separate times.

2  Plaintiff responded by stating that this is exactly what happened.  Plaintiff testified that at no

3  point in time was she aware that she was taking video.  She said that since did not see the videos

4  until a few months ago, she could not admit to something she had not seen.  Plaintiff testified

5  that she does not dispute the witnesses' accounts of plaintiff spanning the room with her cell

6  phone, but stated that she can not see close, far away, or with the glare.

7        B.  Sergeant Dreher[7]

8        Sergeant Dreher testified that he was on duty for the El Dorado County Sheriff's

9  Department on July 16, 2010.  He was summoned to the courthouse after being informed that

10  plaintiff had been arrested.  Sgt. Dreher went to the courtroom where plaintiff was handcuffed,

11  with her cell phone and digital recorder on the table in front of her.  He then applied for a search

12  warrant and presented it to Judge Phimister, who signed the warrant that day at approximately

13  10:15 a.m.  The cell phone was then given to Detective Tracy to download its contents and

14  transfer to a disc.  The phone examination report is generated from these contents, of which

15  pages 1, 16 and 17 were marked for admission as Exhibit 3.  Videos numbered 1 through 5 were

16  taken from plaintiff's cell phone and the report reflects that videos numbered 2 through 5 were

17  taken on July 16, 2010, and that the videos were extracted from the phone on that date, as

18  verified by Sgt. Dreher.  Sgt. Dreher testified that he was not aware of any technology that would

19  permit changing the date reflected on videos downloaded.  When defense counsel explained that

20  he was using a program to show the videos in greater clarity, plaintiff objected, seeking that they

21  be shown in the same mode in which they were seized.  The court overruled the objection at that

22  time, advising plaintiff that she could use cross-examination to make her point, and could present

23  the videos in another mode at a later time if she so wished.  Videos numbered 2 through 5 were

24

25       [7]  In addition to his testimony, Sgt. Dreher submitted a declaration in support of defendants' motion, attaching his incident report, the executed search warrant and affidavit, the

26  Phone Examination Report, and a CD of the four videos retrieved from the phone. (Dkt. no. 36.)

then played, and later admitted into evidence as Exhibit 4.

Plaintiff cross-examined Sgt. Dreher, questioning him about the chain of custody of her cell phone. He testified that he first retrieved plaintiff's cell phone at approximately 9:30 a.m. from a table near where she was sitting at the time she was arrested in jury room number one. He had possession of the phone until about 2:30 p.m. that day. It was either on his person or in the front seat area of his car, when he was in the car, the entire time. At approximately 2:30 p.m., he gave the phone to Detective Tracy to perform the analysis. Later that afternoon, he retrieved the phone from Detective Tracy, took it to his office, wrote the report, and then booked it into evidence. During the time he had possession of the cell phone, Sgt. Dreher testified that he did not view the videos on it. He also did not take any videos with the phone, and did not observe anyone take videos with the phone.

C. Jacqueline Davenport

This witness was employed by El Dorado County Superior Court as Assistant Court Executive Officer on July 16, 2010. She testified that she was meeting with staff when she observed plaintiff in the lobby panning the room with her cell phone, seeming to be videotaping with it. This witness demonstrated how plaintiff was holding the phone. It was held at arm's length, directly in front of plaintiff, in a vertical position, and was being panned across the lobby, from right to left. The panning activity led this witness to believe plaintiff was videotaping rather than taking a still photo. According to this witness' testimony, plaintiff was not pushing buttons on her phone. Ms. Davenport viewed the videos as played by defense counsel and testified they were consistent with how plaintiff appeared to be videotaping on that date.

On cross-examination, Ms. Davenport testified that she observed plaintiff videotaping for a few minutes, and possibly five minutes. She did not recall whether plaintiff was continuously holding the phone upright the whole time. Ms. Davenport was standing at the security station during this observation, talking to Deputy Brown, and was about ten to fifteen feet away from plaintiff. She testified that during this time, she did not observe Deputy Brown

1    approach plaintiff.

2        D. <u>Michelle Tuttle</u>

3            This witness is a court reporter who was working at the courthouse on July 16,

4    2010.  She observed plaintiff at approximately 8:30 a.m. or soon thereafter, in the lobby outside

5    the Clerk's Office.  Plaintiff was sitting with her back to the wall, with her phone at shoulder

6    height, holding it with both hands and appeared to be filming, videotaping or photographing with

7    it.  Ms. Tuttle demonstrated how plaintiff was holding her phone, which was in a vertical

8    position.  She thought plaintiff was videotaping with the phone rather than taking photos because

9    of the position of plaintiff's arms and hands, but she did not know if she was videotaping as

10   opposed to taking photos.  Ms. Tuttle did not observe plaintiff pushing buttons on her cell phone.

11   After viewing the videos in court, Ms. Tuttle testified that they were consistent with what she

12   saw plaintiff doing that morning.

13           On cross-examination, Ms. Tuttle testified that she saw plaintiff videotaping for

14   seconds because this witness was walking across the lobby and then went into the Clerk's Office.

15   In regard to her interaction with Ms. Davenport, Ms. Tuttle testified that Ms. Davenport does not

16   work in the courthouse building but was present that day based on issues having to do with

17   plaintiff.  When questioned about her witness statement's comment that plaintiff was videotaping

18   a CPS worker, Ms. Tuttle also testified that based on the video she saw, she thought it was Ms.

19   Hutley, but she was not sure.  Ms. Tuttle testified that she did not know for a fact that plaintiff

20   was videotaping as opposed to taking still photos, but she made this assumption based on

21   plaintiff's actions with her cell phone which were consistent with videotaping.

22       E. <u>Michelle Vien</u>

23           This witness was an employee for Court Appointed Special Advocates ("CASA"),

24   a nonprofit organization, on July 16, 2010.  Ms. Vien is a case manager so she is in charge of

25   volunteer advocates who attend dependency court hearings with foster children.  On this date, the

26   witness was standing to the side of plaintiff in the lobby.  She observed plaintiff holding up her

1   cell phone and following her around the room.  She does not think plaintiff was taking still

2   photos because as this witness moved, plaintiff followed her with her phone.  Ms. Vien then

3   moved out of plaintiff's sight to hide, and observed plaintiff holding the phone straight out from

4   her shoulder, and videotaping other people in the lobby.  This witness then demonstrated how

5   plaintiff was holding the phone, which was about a foot from plaintiff's head, and scanning the

6   phone back and forth across the room, depending on who plaintiff was tracking or following with

7   it.  Ms. Vien could not remember if the phone was being held in a vertical or horizontal position.

8   Plaintiff was not pushing buttons on her cell phone and was not squinting as if she was having a

9   difficult time seeing.  Defense counsel played video number 3 for this witness who identified a

10  foster child and his guardian, as well as Pamela Hutley, a social worker who handles adoptions

11  for CPS.  When shown video number 4, the witness identified another guardian of the boy who

12  had been in the previous video.  In video number 5, the witness identified Barbara Newman, a

13  panel attorney for dependency court, as well as Michelle Tuttle, court reporter.  When asked if

14  the videos shown were consistent with Ms. Vien's observations that plaintiff was videotaping at

15  the courthouse on July 16, 2010, she responded in the affirmative.

16          On cross-examination, Ms. Vien testified that after she hid from plaintiff's cell

17  phone, she observed plaintiff for three minutes.  Plaintiff continued to hold her cell phone up as

18  if videotaping.  During this three minute time period, plaintiff picked up her phone and put it

19  down three to four times after the time she tracked Ms. Vien with her phone.  Ms. Vien then went

20  over to Rosalie Tucker, a supervisory employee in the Clerk's Office, to report that she thought

21  plaintiff was videotaping, and Tucker responded, "yeah, I know."

22          F. Analysis of Material Perjury Allegation

23          The undersigned first relies on his own eyes.  The pertinent cell phone videos

24  were played and replayed at evidentiary hearing.  While Video #2 was consistent with a fumbling

25  of buttons (presumably of nothing in particular and plaintiff's leg), or an experiment to see how

26  the video feature on the phone worked, or was working, there is *no doubt* that videos #s 3,4, and

5 were purposefully taken, aimed and designed to record certain persons and activities in the

courthouse.  The videos were stable, i.e., not jerking around, and focused.  The cell phone camera

was panned to take into focus different persons and activities. It defies reasoning and common

experience to believe that such videos were accidentally created by an errant fumbling with

buttons.

       Plaintiff's concession on examination at the evidentiary hearing that she pushed

her video on and off four separate times is consistent with the Phone Examination Report and

videos themselves, as well as the testimony of three witnesses who observed the videotaping.  If

plaintiff were accidentally pushing buttons, it would be highly unlikely that she could start and

stop the video in this precise manner and take the four videos if she was only randomly pushing

buttons.

       Sgt. Dreher's testimony verified a solid chain of custody of plaintiff's phone, to

refute plaintiff's claims that the videos were taken by Sheriff's Department deputies or

courtroom staff without her knowledge after the phone was taken from her.  There was no

possibility that anyone else could have taken videos on the subject date and times. [8]

       Further supporting plaintiff's perjury is the testimony of three eyewitnesses, all of

whom testified consistently with each other, and demonstrated how plaintiff was not randomly

pushing buttons on her phone but rather intentionally panning the room with her phone held in an

upright, arm's length shoulder height position.  Ms. Davenport testified that she observed

plaintiff holding her phone in a vertical position at arm's length directly in front of her and was

---

[8]In this regard, plaintiff had objected to admission of Exhibit 3 into evidence, arguing that it was illegally seized and further that it was out of her possession for a long time.  The objections were overruled and this exhibit was admitted into evidence.  Search of the phone was legal pursuant to a warrant obtained by Sgt. Dreher, as testified to by that witness, and supported by his declaration.  (Dkt. no. 36, Ex. 2.)  Furthermore, the exclusionary rule does not apply in civil proceedings brought under 42 U.S.C. § 1983.  Ingram v. City of Los Angeles, 418 F.Supp.2d 1182, 1190 (C.D. Cal. 2006).  See also Willis v. Mullins, 517 F.Supp.2d 1206, 1223-24 (E.D. Cal. 2007); Townes v. City of New York, 176 F.3d 138, 149 (2d Cir.1999); Wren v. Towe, 130 F.3d 1154, 1158 (5th Cir.1997).

panning it across the lobby.  According to this witness, plaintiff was not randomly pushing buttons on the phone.  The testimony of Ms. Tuttle and Ms. Vien were consistent with that of Ms. Davenport.  Ms. Tuttle recognized herself in one of the videos, and testified that the videos were consistent with what she observed plaintiff doing.  In addition, Ms. Vien recognized a child, his guardians, a family law attorney and a CPS worker in the videos.  Ms. Vien testified that plaintiff was videotaping for about three minutes, and picked her phone up and put it down about three to four times after plaintiff had tracked Ms. Vien with her phone, which is consistent with the exhibits demonstrating four videos taken at the courthouse that day, as well as the length of those videos.

Moreover, plaintiff's version of events is internally inconsistent, and belies reliance on the "I did not have my glasses, so therefore I could not have been videotaping" excuse.  She set forth in pleadings and testified that on the videotaping incident day, she was doing what she always did with her cell phone, e.g., playing games, looking at texts or e-mails – certainly activities which took some visual acuity, and ability to visually manipulate the phone. However, when it came to using the cell phone for videoing purposes, she supposedly could not see the buttons on her phone well enough to possibly videotape.  The undersigned does not believe it.

She also testified that she does not "know how to do videos."  In her declaration submitted in support of her opposition to defendants' motion for terminating sanctions, plaintiff stated that her deposition testimony was "truthful and honest and given in good faith to the best of [her] ability."  At the evidentiary hearing, plaintiff continued to testify that she was merely pushing buttons on her phone, but for the first time testified that she possibly could have unknowingly videotaped with it.  Plaintiff explained her reason for changing her position from "absolutely not videotaping" to not purposefully videotaping, as based on defendants' production of the actual videos within the last few months, which she had never before seen.

\\\\\

1          Thus, the false statements in this case on the material fact of videotaping in the

2    courthouse have been continuous, albeit ever evolving in their falsity. The question becomes

3    whether these statements themselves warrant a dismissal of the case.  Plaintiff thought enough

4    about their importance to place them in the amended complaint.  She testified to them in

5    deposition under oath.  She asserted that county officials obstructed justice by creating false

6    evidence.  This perjury was capped off by false testimony *in court* as well.  In light of their

7    materiality and numerosity, the undersigned recommends dismissal of plaintiff's case.[9]

8    V. <u>Additional Misconduct</u>

9          In addition to the false videotaping testimony, plaintiff's actions during discovery

10   have thwarted the truth seeking process.  First, defendants have been required to reschedule

11   plaintiff's deposition a number of times due to her lack of cooperation.  After plaintiff repeatedly

12   asked for continuances, defendants finally refused to reschedule and plaintiff failed to appear at

13   her properly noticed deposition.  Plaintiff also refused to produce documents that were

14   propounded on December 8, 2011.  Based on these actions, defendants filed a motion to compel.

15   In opposition, plaintiff's declaration, falsely stated under oath that the motion to compel was

16   unnecessary because she agreed to appear for her deposition on February 3, 2012, and to bring all

17   documents in her possession.  (Dkt. no. 26.)  Mr. Caulfield's reply declaration states that the

18   parties had no such agreement.  (Dkt. no. 27-1, ¶ 2.)  On February 23, 2012, the court ordered

19   plaintiff to appear at her deposition, produce documents, and produce written responses to

20   discovery.  Plaintiff's conduct was found sanctionable in the amount of $2,220.  At this time,

21   plaintiff was warned that failure to comply with that order would result in further sanctions,

22   including dismissal of her case and possible contempt charges.  (Dkt. no. 29.)

23

24          [9]The undersigned has considered the context in that defendants had access to the
     videotapes prior to the deposition; thus was plaintiff purposefully "set up to fail" with the
25   deposition questions.  The answer is "no."  It was plaintiff who initially denied in her pleadings
     that she was videotaping, and defendants had every right to have plaintiff testify to the truth of
26   falsity of such material assertions in deposition.

1   When plaintiff finally appeared for her deposition, she was evasive and

2   obstructive throughout the eleven hours that it took, when it should have taken seven hours or

3   less.  Although plaintiff brought documents to the deposition, she could not state whether they

4   were Rule 26 disclosures or in response to defendants' request for production of documents.

5   Furthermore, plaintiff to this date has not provided written responses to discovery at her

6   deposition as required by the order.  The documents she submitted to the court as consisting of

7   all documents in her possession, (dkt. no. 43), do not constitute "written responses."

8   The extent and character of the  misconduct, and the course of discovery in

9   general is well exemplified by deposition excerpts.  The undersigned will set forth several

10  excerpts so as to dispel any notion that the misconduct was isolated.

11  Q.  Have you had your deposition taken before?

12  A.  A deposition with this lawsuit?

13  Q.  No. Just in any lawsuit, have you ever had your deposition taken before?

14  A.  Could you elaborate on that question?

15  Q.  Have you ever sat in a room like this where you have a court reporter that takes down and

16  transcribes your testimony?

17  A.  I don't understand what the question has to do with why we're here today.

18  Q.  Well, if –

19  A.  If you could elaborate on that, I'm – I'm...

20  Q.  Sure.  In federal court the objection of relevance is not an objection that will be sustained in

21  federal court.  I am allowed to ask you questions and you're required to respond to those

22  questions unless you have a basis to assert a privilege.  In other words, relevance is not a good

23  objection in a federal court deposition.

24  A.  Uh-huh.

25  Q.  So the question remains, have you ever had your deposition taken before?

26  A.  I don't understand how that is pertinent to what is going on here today.

1 (Arnold Dep. at 7-8.)  This question is discussed at length for almost three more pages of

2 transcript, without plaintiff ever providing a response. (Id. at 8-11.)

3                                          ***

4 Q. What is your current phone number?

5 A.  I don't recall.

6                                          ***

7 Q. Are you married?

8 A. I don't recall.

9 (Id. at 41:11-12.)

10 Q. Are you currently employed?

11 A. No.

12 (Id. at 50:13-14.)

13 [At the time of her deposition plaintiff was employed as an independent contractor with Platinum

14 Group Real Estate Investments.  (Caulfield Dec. ¶¶ 9-10).]

15 Q. What is Platinum Group?

16 A. I don't recall.

17 (Id. at 52:16-17.)

18 [Plaintiff signed e-mails sent to other Platinum Group personnel with the signature:

19 Penny Arnold/DRE #01905858
Platinum Group Real Estate Inv., Inc.
20 D/b/a/ Keller Williams Realty
2365 Iron Point Road, Suite #120
21 Folsom, CA 95639
Office: 916.235.7012
22 email: penny@sellingnorcal.com

23 Caulfield Dec. ¶¶ 9-10.]

24                                          ***

25 Q.  Did Mr. Watts draft your second amended complaint?

26 A.  I don't recall.

1    Q.  Did you draft your second amended complaint?

2    A.  I don't recall.

3    (Id. at 77:22-78:1.)

4                                                            ***

5    [in attempting to ascertain whether plaintiff still suffers from alleged residual injuries.]

6    Q. Does anything hurt?

7    A. – a hypothetical.

8    Q. Any body part hurt today?

9    A. I would rather provide information from a professional doctor [who] can state what exactly

10   these injuries are.

11   .....Q. Okay.  Are you suffering from any pain today?

12   A.  That needs to come from a professional medical physician.

13   See id. 272:44-274:25.

14           Many more excerpts, not listed here, document the obstreperousness/falsity of the

15   deposition answers.

16           The complete lack of cooperation evidences affirmative bad faith, and has been

17   solely within the control of plaintiff.  "[D]isobedient conduct not shown to be outside the control

18   of the litigant" is all that is required to demonstrate willfulness, bad faith or fault.  Henry  v. Gill

19   Industries, Inc, supra, 983 F.2d at 949, quoting Fjelstad v. American Honda Motor Co., Inc.,

20   supra, 762 F.2d at 1341.  When the entire course of discovery is viewed along with perjury on a

21   material fact, there is ample justification for recommending dismissal.

22           The undersigned does not believe, given the perjury found previously, that the five

23   "Malone" factors previously set forth[10]  need be addressed as the perjury stands on its own as a

24   _____

25           [10]        (1) the public's interest in expeditious resolution of litigation;
                      (2) the court's need to manage its docket;
                      (3) the risk of prejudice to the other party;
26                     (4) the public policy favoring disposition of cases on their merits;

                                          24

1   reason for dismissal.  However, if applied, they too point to a dismissal for abuse of the discovery

2   process when the totality of plaintiff's misconduct is assessed.  This circuit has acknowledged

3   that "[l]ike most elaborate multifactor tests, our test has not been what it appears to be, a

4   mechanical means of determining what discovery sanction is just."  Valley Engineers Inc. 158

5   F.3d at 1056.  Inevitably where a court order is violated or discovery belatedly is produced,

6   factors 1 and 2 support preclusive sanctions, and factor 4 cuts against them.  Prejudice to the

7   opposing party and the availability of less drastic sanctions, factors 3 and 5, are most often

8   decisive.  Id.  Most critical for evaluating the risk of prejudice and whether less drastic sanctions

9   would suffice is whether the discovery violations "so damage[] the integrity of the discovery

10  process that there can never be assurance of proceeding on the true facts."  Valley Engineers Inc.,

11  158 F.3d at 1058.

12          The Ninth Circuit has held that "[a] defendant suffers prejudice if the plaintiff's

13  actions impair the defendant's ability to go to trial or threaten to interfere with the rightful

14  decision of the case."  Adriana Int'l Corp. v. Thoeren, 913 F.2d 1406, 1412 (9th Cir. 1990).

15  Defendants, as well as the court, have been prejudiced in both these ways.  Defendants' inability

16  to obtain the most basic and initial discovery from plaintiff are no longer tolerable at this stage of

17  pretrial proceedings, where the case has been pending in this court for over 20 months.  At the

18  time when both parties should be consolidating and refining their respective positions,

19  defendants have been forced to formulate their case around gaping omissions and guesswork.

20  The court is in no better position to overcome such overwhelming problems.  The court has an

21  interest in the efficient resolution of cases and managing its own docket, and does not have time

22  to resolve each and every discovery dispute by reviewing every motion describing plaintiff's total

23  lack of responses and participation which would have been unnecessary but for plaintiff's bad

24  faith.

25  ─────────────

26          and
        (5) the availability of less drastic sanctions.

1    In this case, even the "merits" factor favors dismissal as one cannot reach the true

2  merits of a case if false or evasive testimony is given and other discovery obligations are ignored.

3    Moreover, no less drastic sanction appears appropriate.  Monetary sanctions

4  would clearly be to no avail as plaintiff continued to refuse to comply with her discovery

5  obligations even after monetary sanctions were ordered.  Evidence preclusion would also be to

6  no avail as plaintiff either testified falsely or provided no evidence on routine deposition

7  questions.  The discovery deadline of May 17, 2012 is long past, and the trial date of October 1,

8  2012 was looming[11]; however, the parties are no further along than they were a year ago.  The

9  court holds out no hope that plaintiff would proceed with her case in a truthful manner or be

10  willing to provide legitimately sought discovery.  The abusiveness of plaintiff's discovery

11  responses indicate a lack of cooperative spirit.  "A judge with a caseload to manage must depend

12  upon counsel [and/or the parties] meeting each other and the court halfway in moving a case

13  toward trial."  Buss v. Western Airlines, Inc., 738 F.2d 1053, 1054 (9th Cir. 1984).  Thus, the

14  court concludes, particularly in light of plaintiff's perjury, that no sanction short of dismissal

15  would be appropriate.

16    In summary, plaintiff's willful disregard of the Federal Rules, her lack of

17  communication and cooperation with defense counsel in regard to all discovery, and most

18  especially her false statements under oath, undermine the judicial process plaintiff herself has

19  invoked.  "[D]istrict courts cannot function efficiently unless they can effectively require

20  compliance with reasonable rules."  Chism v. National Heritage Life Ins. Co., 637 F.2d 1328,

21  1332 (9th Cir. 1981), overruled on other grounds, Bryant v. Ford Motor Company ("Bryant II"),

22  844 F. 2d 602, 605 (9th Cir. 1988) (en banc).  It is therefore the conclusion of this court that there

23  is no effective alternative short of dismissal.

24  \\\\\

25

26    [11]It has now been vacated.

26

VI. Monetary Sanctions

Defendants additionally request monetary sanctions for, at a minimum, $9,590.70 in fees and costs incurred in preparing and conducting plaintiff's deposition, and in bringing the instant motion, and at a maximum, $53,806.19 in fees and costs incurred in litigating this matter since its inception.

The undersigned believes monetary sanctions are not appropriate, primarily because plaintiff's perjury warrants dismissal, but also because monetary sanctions have been shown to be ineffective as they were previously awarded but had no effect on plaintiff's conduct or behavior in this case.  (Dkt. no. 47 at 2.)  However, in the event that these findings and recommendations are not adopted on the basis of the severity of dismissal, the alternative monetary sanctions will be reconsidered.[12]

CONCLUSION

Accordingly, IT IS ORDERED that:

1.  Defendants' Request for Judicial Notice, filed April 2, 2012, (dkt. no. 35), is granted.

2.  Defendants' motion in limine, filed June 8, 2012, (dkt. no. 55), is denied.

3.  Plaintiff's "Motion to Reconsider," filed June 22, 2012, (dkt. no. 57), is denied.

4.  Plaintiff's "Motion of Injunction," filed June 29, 2012, (dkt. no. 60), is denied.

5.  Plaintiff's "Motion to Amend," filed June 29, 2012, (dkt. no. 61), is denied.

For the reasons stated in this opinion, IT IS HEREBY RECOMMENDED that: Defendants' motion for terminating sanctions, filed April 2, 2012, (dkt. no. 30), be granted, and this action be dismissed.

\\\\\

---

[12] No ultimate calculation of fees and costs will be done at the present time based on this court's opinion that dismissal is the only appropriate sanction.

27

1    These findings and recommendations are submitted to the United States District

2  Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within

3  fourteen (14) days after being served with these findings and recommendations, any party may

4  file written objections with the court and serve a copy on all parties.  Such a document should be

5  captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

6  objections shall be served and filed within fourteen (14) days after service of the objections.  The

7  parties are advised that failure to file objections within the specified time may waive the right to

8  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9  DATED: August 8, 2012

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

GGH:076/Arnold3119.san.wpd

28